**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MATTHEW AARON BLANFORD,
  *Plaintiff-Appellant,*

v.

SACRAMENTO COUNTY; LOU BLANAS,
Sacramento County Sheriff; BRETT
ANDERSON, Sacramento County
Sheriff's Deputy; TODD HENGEL,
Sacramento County Sheriff's
Deputy,
  *Defendants-Appellees.*

No. 03-17146

D.C. No.
CV-01-02068-
GEB/GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
April 15, 2005—San Francisco, California

Filed May 6, 2005

Before: John T. Noonan, David R. Thompson, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Rymer;
Dissent by Judge Noonan

4965

**COUNSEL**

Stewart Katz, John M. Poswall, for plaintiff-appellant Matthew Aaron Blanford.

Terence J. Cassidy (argued), Jennifer E. Duggan, Carl J. Calnero (on the brief), Porter, Scott, Weiberg & Delehant, for defendants-appellees County of Sacramento, Lou Blanas, Brett Anderson, and Todd Hengel.

## OPINION

RYMER, Circuit Judge:

Matthew Aaron Blanford appeals the summary judgment in favor of Brett Anderson, Todd Hengel, Lou Blanas, and Sacramento County[1] in his 42 U.S.C. § 1983 action alleging claims of excessive force and unreasonable seizure in violation of the Fourth Amendment. Blanford was shot and severely injured after he ignored warnings and commands to stop and drop an edged sword that he was carrying and instead tried to enter a house in a residential area. There is no doubt that the facts of this case are tragic and that the case is a difficult one. Nevertheless, because Deputies Anderson and Hengel did not exceed constitutional limits on the use of deadly force when they shot Blanford and because, even if their actions did violate Blanford's constitutional rights, a reasonable law enforcement officer in their position at the time would not have known that shooting Blanford was a violation of clearly established law, the deputies are entitled to qualified immunity. We therefore affirm.

I

On the afternoon of November 13, 2000, the Sacramento County Sheriff's Department received several reports that a

---

[1]Brett Anderson and Todd Hengel are Sacramento County Sheriff's Deputies and are the principal defendants in Blanford's suit. We refer to them collectively as "the deputies" unless context otherwise requires. Lou Blanas, the Sacramento County Sheriff, is sued in both his official and individual capacities.

man (who turned out to be Blanford) wearing a ski mask and carrying a sword was walking through a suburban residential neighborhood outside Sacramento and behaving erratically. Anderson and Hengel were dispatched to investigate these reports. During the course of their search for Blanford, Anderson and Hengel were informed by dispatch that Blanford had been seen licking the sword and that he was walking in the middle of the street. After driving down several streets where Blanford had been seen, the deputies spotted him walking down Reetey Avenue.

When the deputies arrived, they saw Blanford carrying a 2-1/2-foot-long Civil War-era cavalry saber by the handle. Blanford was wearing a green ski mask that was not covering his face, so that it appeared to be a knit cap pulled down over his ears and close to his eyes. When Anderson and Hengel came upon Blanford walking away from their position on Reetey, they got out of their vehicles, drew their guns, and Hengel called out to Blanford: "Sheriff's department, stop, drop the sword." Blanford did not heed this command but rather kept walking. As it turned out, Blanford was listening to a Discman at the highest volume using headphones which were concealed underneath his knit cap. Blanford did not hear the deputies yelling at him and did not notice them at that time.[2] The deputies did not realize until after Blanford was shot that he had been wearing headphones.

The deputies followed Blanford at a safe distance of 20 to

---

[2]There appears to be a genuine dispute of material fact regarding whether Blanford noticed the deputies and heard their command when they first called out to him on Reetey Avenue. Anderson and Hengel both testified that, after Hengel called out the first time, Blanford turned his head and looked back at them over his shoulder. However, Blanford testified that he did not notice or hear the deputies before he turned from Reetey onto Gaines Avenue, and he specifically denied looking back behind himself before he turned onto Gaines. Since these two accounts conflict on this point, Blanford's version must be taken as true for summary judgment purposes.

25 feet as they were trained to do for persons with edged weapons. Their guns were drawn and aimed. They were "extremely concerned that Blanford posed a significant danger to any individual who might come near him or to [themselves] if he turned and charged." Anderson and Hengel continued to shout commands at Blanford to stop and drop the sword, as well as to warn him "We'll shoot." At the corner of Reetey and Gaines Avenue, Blanford stopped, raised the sword, and made a loud growling or roaring sound.[3] This increased the deputies' concern that Blanford posed a risk of physical harm to themselves or others, and the deputies considered Blanford's action to be the felony of drawing or exhibiting a deadly weapon with the intent to resist or prevent arrest or detention by a peace officer in violation of California Penal Code § 417.8 (1982).

Blanford then turned onto Gaines Avenue and began angling his walk toward 8679 Gaines, which turned out to be his parents' home where he lived. The deputies did not know this. Blanford testified that he first became aware of the deputies' presence behind him as he was passing his next door neighbor's house, but despite his awareness that the deputies might be there for him, he continued walking at the same pace toward 8679. The deputies considered whether Blanford might be mentally disturbed or under the influence of narcotics, but believed they "had to secure the weapon before doing anything else in order to protect the public." As it turned out, Blanford had just taken a dose of antipsychotic medication for schizophrenia and bipolar disorder for which he was being treated. Blanford walked up the lawn of 8679 to the front door, where he searched his pockets for his keys but realized

---

[3]Blanford testified that he did not remember whether or not he stopped at the corner of Reetey and Gaines, raised the sword, and made a growling or roaring sound. This is not sufficient to allow a reasonable jury to conclude that Blanford did not do these things; Blanford's and the deputies' accounts are not mutually exclusive. Thus, the district court properly took the deputies' account on this point as true.

he did not have them. He knocked on the door, but no one answered. Blanford then started walking down the walkway that led in front of the house, past the driveway and garage, and around to the side where there was a gate that led alongside the garage to the back yard. As he turned onto the walkway, Blanford caught a glimpse of the deputies, believed that they were police officers, and heard them shout "Drop the sword." He did not do so. Blanford thought he told the deputies that he was going to go put the sword in the back and come up and talk to them afterwards. Both deputies testified that they never heard any such thing, though even if they had, it would not have alleviated their reasonable concern that Blanford posed an imminent threat as he did not drop the sword.

Neither deputy believed that Blanaford should be allowed to get out of sight into the back of the house due to the danger he presented to anyone in the yard or the house. Both fired as Blanford rounded the corner of the house to the gate ("the first volley"). Blanford was hit by at least one shot. Nevertheless, he went through the gate, and it closed behind him. Anderson kicked the gate open and saw Blanford about ten feet away trying to open a door into the garage through which entrance could be gained into the residence. Anderson ordered him to drop the sword again. When Blanford did not drop the sword, or stop trying to push the door open, Anderson fired again, hitting Blanford in the right wrist ("the second volley").[4] He did so out of concern that Blanford would be able to get into the residence and cause death or injury to people inside. Blanford then turned away, still holding the sword, and walked toward the back yard.[5] Anderson continued firing

---

[4]Anderson did not realize he had hit Blanford in the right wrist during the second volley until after the shooting ended and Blanford had fallen to the ground.

[5]Blanford testified that he did not know whether he was holding the sword or not. Anderson testified that Blanford did not drop the sword when he was hit by the second volley near the garage door. Hengel testified that he retrieved the sword from where it had fallen near where Blanford fell after the third volley, and threw it away from that area.

("the third volley"). One of the bullets severed Blanford's spine, causing him to fall to the ground and rendering him a paraplegic. The entire encounter lasted about two minutes. Approximately fourteen seconds passed between the first and last shots.

Blanford filed this action against Anderson, Hengel, Sacramento County Sheriff Lou Blanas (in both his individual and official capacities), and Sacramento County and its Sheriff's Department, asserting claims under 42 U.S.C. § 1983 for excessive force and unreasonable seizure and false arrest in violation of the Fourth Amendment, including a claim of *Monell*[6] liability against the County. Blanford also asserted state-law claims for battery and assault against all the defendants, as well as state-law claims for negligence and for negligent hiring, training, and supervision against the County.[7]

After discovery, cross-motions for summary judgment were filed on all claims. The district court analyzed each of the three volleys separately under *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985). The court concluded that Anderson and Hengel acted in an objectively reasonable manner in firing each volley, because a reasonable officer in their position at the time would have believed that Blanford presented an imminent threat of death or serious bodily injury to persons inside the house or yard of 8679 Gaines, or to themselves. The district court also granted summary judgment on Blanford's wrongful arrest claim, finding that the deputies had probable cause to arrest Blanford for violating California Penal Code § 417.8. It further held that, even if Anderson's or Hengel's actions violated Blanford's Fourth Amendment rights, the deputies were entitled to quali-

---

[6]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[7]Blanford also asserted a state-law medical malpractice claim against Kaiser Permanente and the doctor who had prescribed him the antipsychotic medication the same day he was shot by the deputies. Blanford does not appeal dismissal of this claim.

fied immunity because a reasonable officer in their position at the time would not have known that their actions were unlawful.[8]

Blanford timely appealed.

## II

Our review on appeal from entry of a summary judgment is de novo. *Deorle v. Rutherford*, 272 F.3d 1272, 1278 (9th Cir. 2001) (as amended). Under the approach for evaluating claims of qualified immunity adopted by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), we must first ask whether, "[t]aken in the light most favorable to [Blanford], . . . the facts alleged show [the deputies'] conduct violated a constitutional right?" *Id.* at 201. Only if this question is answered in the affirmative must the court address "the next, sequential step" in the inquiry, namely, whether the constitutional right at issue was clearly established at the time the deputies shot Blanford in November 2000, such that a reasonable officer in the deputies' position at the time would have known that shooting Blanford was a violation of his Fourth Amendment right to be free from excessive force. *Id.* at 201-02. As the Court noted in *Saucier* and reiterated recently in *Brosseau v. Haugen*, 125 S. Ct. 596 (2004), "[i]t is important to emphasize that this inquiry 'must be undertaken in light of

---

[8]The district court also granted summary judgment to Blanas in his individual capacity, finding no triable issue that Blanas ratified the deputies' actions knowing them to have used excessive force, and to the County and Blanas in his official capacity for lack of evidence that the County maintained a policy or practice of ratifying deputies' use of excessive force. The court granted summary judgment on Blanford's state-law claims as well. Blanford makes no arguments on appeal challenging the district court's rulings on these claims other than to note that they rise or fall with the Fourth Amendment excessive force claim. Given that we affirm on that claim, we also affirm the judgment on the municipal liability and state-law claims. Blanford does not mention his Fourth Amendment wrongful arrest claim in his opening brief, which waives appeal on that issue. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

the specific context of the case, not as a broad general proposition.' " *Id.* at 599 (quoting *Saucier*, 533 U.S. at 201).

### III

**[1]** All claims of excessive force, whether deadly or not, are analyzed under the objective reasonableness standard of the Fourth Amendment as enunciated in *Graham* and *Garner*. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). This balancing test entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

**[2]** *Garner* articulates a more particularized version of the Fourth Amendment's objective reasonableness analysis for assessing the reasonableness of deadly force.[9] The Court explained that while it is unreasonable to apprehend an unarmed, nondangerous suspect by killing him, an officer's use of deadly force to prevent escape satisfies Fourth Amendment standards "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.

---

[9]There is no question in this case that the deputies' firing of their guns at Blanford constituted deadly force, whether defined as force reasonably likely to cause death (as it was at the time of the events giving rise to this case) or as force creating a substantial risk of causing death or serious bodily injury (as it is today). *See Smith v. City of Hemet*, 394 F.3d 689, 704-07 (9th Cir. 2005) (en banc), *overruling Vera Cruz v. City of Escondido*, 139 F.3d 659, 663 (9th Cir. 1998) (as amended).

Blanford argues that probable cause under *Garner* exists only if the suspect is immediately or directly threatening the officer or others with a weapon, or the suspect recently committed a crime involving the infliction or threatened infliction of serious physical harm and deadly force is necessary to prevent escape. He maintains that this standard cannot be met here, because he had not committed a significant crime or threatened anyone, and was walking away from the deputies when they fired the third volley that severely injured him. As Blanford puts it, officers may not use deadly force "just in case" a suspect might find someone to harm, yet, he submits, this is what happened to him.

If Blanford were correct that the threat of harm from his conduct was purely hypothetical and could not objectively have been perceived otherwise, then the constitutional limits on use of deadly force would certainly be implicated. In hindsight, from his point of view, it is understandable to think so. As it turned out, Blanford did not hear all of the deputies' warnings because he had earphones on. He was on medication that may have affected his behavior and his judgment. And in fact there was no threat to others because Blanford lived at 8679 Gaines and no one was home at the time. However, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We conclude that from this perspective, the deputies had cause to believe that Blanford posed a serious danger to themselves and to anyone in the house or yard that he was intent upon accessing, because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down.

A

**[3]** By the time of the first volley, Anderson and Hengel knew that citizens had called 911 reporting peculiar behavior by a person with a sword. Blanford was in fact armed with a

2-1/2-foot sword. The deputies knew that Blanford failed to communicate or comply with their orders to stop and drop the sword, and did not respond to their warnings that they would shoot if he did not comply. Instead, he raised his sword and growled. This was a crime, and in addition gave the deputies cause to believe that Blanford posed a threat of harm to whomever he encountered. They saw Blanford move purposefully toward the house at 8679 Gaines, which they were unaware was where he lived; try unsuccessfully to gain entry through the front door; and start around the corner of the house toward a gate that would have blocked the deputies but allowed Blanford access to the side of the house and back yard. They considered the possibility that Blanford might be mentally disturbed or under the influence of a controlled substance, but acted, consistent with their training, to secure the weapon first. The deputies' decision to fire was based upon Blanford's refusal to heed warnings and commands to drop the sword, as well as his attempt to enter a private residence and backyard with a lethal weapon. These facts objectively, and reasonably, led the deputies to conclude that the situation could not be resolved by talking, and that Blanford posed an immediate and unacceptable risk of harming whoever was in the house or yard should he be allowed to escape beyond the gate.

The cases upon which Blanford relies to show that the use of deadly force was not justified — *Haugen v. Brosseau,* 351 F.3d 372 (9th Cir. 2003) (as amended), *rev'd*, 125 S. Ct. 596 (2004) (reversing on qualified immunity without expressing opinion on the constitutional question); *Harris v. Roderick,* 126 F.3d 1189 (9th Cir. 1997); and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) — presented quite different situations to the officers involved. In *Haugen*, an officer shot a suspect who was trying to flee in his vehicle because she believed he posed a danger to other officers (not to herself) who might be approaching the driveway. However, the evidence showed that she knew where the other officers would be coming from and would necessarily have known that none

was in harm's way. We found this was objectively unreasonable. Unlike Officer Brosseau in *Haugen*, the deputies in this case could not have perceived that there was no one in harm's way. While it is true that the deputies did not know if anyone were at home or in the yard at 8679 Gaines, it was objectively reasonable for them to be concerned for the safety of whoever was there, and for themselves.

In *Harris*, which arose out of the standoff at Ruby Ridge, an FBI agent shot a suspect who was in an open space returning to a cabin that he had come out of and which agents knew was occupied by his friends. The agent could see that Harris posed no threat to anyone at the moment, but he fired without warning pursuant to the FBI's special rules of engagement that authorized agents to shoot to kill any armed adult male regardless of whether he posed an immediate threat of serious physical harm to agents or others. It was clear that this exceeded Fourth Amendment bounds under *Garner*. Unlike the FBI agent in *Harris*, the deputies here knew that Blanford was armed with an edged sword that he refused to drop despite orders to do so and despite warnings that he would be shot if he did not. Their concern that he posed a significant risk of serious harm to anyone inside the house or yard, and to themselves, is supported by this evidence and the fact that he continued to hold the sword while trying to access a private residence and yard with which they were unaware he had any connection.

Finally, in *Deorle*, officers were called by Deorle's wife who was concerned that her husband was out of control. Thirteen officers responded, removed the family as well as neighbors, and surrounded the house to ensure that Deorle had no avenue of escape. Deorle was generally compliant. After a half-hour or so of observation he started shouting at the officers while carrying an unloaded plastic crossbow in one hand and a bottle of lighter fluid in the other. Rutherford told Deorle to drop the crossbow, which he did. However, when Deorle passed a virtual line in the grass that Rutherford had

drawn, Rutherford fired a "beanbag" round without warning, and without having told Deorle to stop or to drop the lighter fluid. Unlike Officer Rutherford in *Deorle*, before firing at Blanford the deputies repeatedly ordered him to stop and drop the sword, and specifically warned Blanford that they would shoot unless he did; unlike Deorle, Blanford was not compliant. In this case, the deputies had only a few minutes to act, so there was no time to remove residents at 8679 Gaines or neighbors from the area. Blanford suggests that the deputies knew help was on the way and, like the officers in *Deorle*, should have been patient. The difference, however, is that Blanford had been warned, was noncompliant, and appeared intent on accessing a private residence. The fact that help may have been on the way was immaterial in the circumstances of imminent access. Blanford also suggests that deadly force was inappropriate because he, too, appeared emotionally disturbed and should not have been treated as if he were a violent criminal who had committed a serious offense. *See Deorle*, 272 F.3d at 1282-83 (indicating that tactics to be used "against an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense"). The deputies did factor the possibility of Blanford's being mentally disturbed into their thinking, as they should have, but Blanford was armed with a dangerous weapon and it was not objectively unreasonable for them to consider that securing the sword was a priority. *Id.* at 1283 (recognizing that there is no per se rule requiring mentally disabled persons to be treated differently from "serious criminals").

**[4]** We conclude that the first volley was objectively reasonable and that the deputies had probable cause to believe that Blanford posed a threat of serious physical harm to themselves, or to others, because he was armed, refused to give up his weapon, was not surrounded, and was trying to get inside a private residence or in default of that, into the back yard,

where his sword could inflict injury that the deputies would not then be in a position to prevent.

B

**[5]** Despite being hit during the initial volley, Blanford went through the side gate, closing it behind him, and when next seen by Anderson was about ten feet away trying to open a door into the garage. The second volley was also a reasonable use of deadly force under the circumstances because Blanford was still carrying the sword and attempting to gain access to the residence. He was also quite close to the deputies. Nothing else in the balance of factors already present had changed when Anderson fired again, and a reasonable officer in his position would have believed that doing so was necessary to neutralize the threat that Blanford posed to people on the premises.

C

Although Blanford had been hit again in the second volley, he turned away from Anderson and headed toward the yard before the third volley. On this account Blanford contends that he was clearly in the deputies' sight and was not escaping, as, for example, was the suspect before he was shot in *Forrett v. Richardson*, 112 F.3d 416 (9th Cir. 1997), *overruled on other grounds by Chroma Lighting v. GTE Prods. Corp.*, 127 F.3d 1136 (9th Cir. 1997). Forrett had committed a violent residential burglary, shot and tied up several victims, escaped in a truck with firearms and ammunition, and eluded police on foot by jumping over fences and crossing residential yards before he was eventually cornered, tried to escape by climbing over a fence, and was shot. *Forrett* did indeed present a case of extreme escape, but this does not mean that the deputies in this case could not reasonably believe that Blanford, who was armed with a dangerous weapon that he refused to drop and whose conduct manifested a continuing

intent to evade their authority and enter a private residence, presented a danger to themselves or others.

**[6]** Blanford makes the further point that, even if still armed with the sword, he was not holding it in any threatening manner. He also notes that even so, there was no known person in the vicinity. These factors, together with the severe injury inflicted, make the third volley the most difficult. However, from the deputies' position at the time, we cannot say that it was objectively unreasonable for Anderson not to stop firing when Blanford did not stop moving or holding the sword. All of the facts and circumstances from the beginning of the encounter must be considered. When they are, the situation confronting Anderson is distinguishable from the situations confronting officers in the cases we have already discussed, and from *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), upon which Blanford also relies on the footing that there, as here, the suspect was shot in the back. Officers had come to Curnow's house following up on a report from the night before that he was physically threatening a woman. They shot Curnow once when it looked as if he were slapping a woman, and again fatally as he tried to leave the house with a gun. We affirmed denial of summary judgment in the officers' favor on qualified immunity because the evidence, viewed in the light most favorable to Curnow, showed that the woman was simply sitting on his lap, Curnow was doing nothing threatening, and he was unarmed at the time he was shot in the back the first time; and that Curnow picked up an unloaded gun by the muzzle as he tried to flee the house and was shot the second time. Here, the deputies knew that Blanford had committed a crime, albeit not a violent one, and was continuing a course of conduct that objectively indicated he was not giving up the sword that made him a threat to anyone in charging range.

**[7]** In sum, Blanford was armed with a dangerous weapon, was told to stop and drop it, was warned that he would be shot if he didn't comply, appeared to flaunt the deputies' com-

mands by raising the sword and grunting, refused to let go of the sword, and was intent upon trying to get inside a private residence or its backyard with the sword in hand. The tragedy is that he persisted even after he admitted seeing the deputies and hearing them order him to drop the sword, resulting in a terrible injury. However, that this happened does not make the deputies' actions objectively unreasonable, or unconstitutional.

## IV

**[8]** It follows that the deputies are entitled to qualified immunity. Even if we have misjudged the constitutional issue, neither Supreme Court nor circuit precedent in existence as of November 13, 2000 would have put a reasonable officer in the deputies' position on notice that using deadly force in the particular circumstances would violate his Fourth Amendment rights. While they certainly would have known from *Garner* and *Graham* that shooting Blanford required probable cause (supported by objectively reasonable facts) to believe that he posed a threat of serious physical harm to themselves or to others, the deputies would not have found fair warning in *Garner*, *Graham*, or any other Supreme Court or circuit precedent at the time that they could not use deadly force to prevent someone with an edged sword, which they had repeatedly commanded him to drop and whom they had repeatedly warned would otherwise be shot, from accessing a private residence where they or people in the house or yard might be seriously harmed. In this they may have been mistaken, but reasonably so. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

Matthew Blanford, a twenty-year-old college student, was shot and rendered a paraplegic by the police of Sacramento

County. The shooting occurred in broad daylight at Matthew Blanford's residence where he lived with his parents. His "crime" had been bizarre behavior — he was on medication for bipolar disorder. At the time that he was shot, he was not threatening the police or any other known person, and he was not attempting to escape. Under these circumstances, the important governmental interest served by sparing the two shooters a jury trial is the interest of protecting impatient officers for conduct for which the County of Sacramento awarded a citation.

The standards to be applied are well-known. Lethal force may not be employed unless necessary to prevent escape "and the officer has probable cause to believe that the suspect poses a significant threat of death or physical injury to the officer or others." *Tennessee v. Garner*, 473 U.S. 1, 3 (1985). The reasonableness of the officer's conduct is to be evaluated with "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Let us look at Matthew Blanford's conduct in terms of these factors.

*The severity of the crime*. The opinion alleges that Matthew Blanford had committed a violation of California Penal Code § 417.8, by raising the sword he carried and uttering some indistinct sounds not discernible as words. Blanford was not convicted of, nor charged with, committing this crime. His act would have been a crime if he had exhibited the sword with the intent to resist or prevent arrest. No showing of such an intent has been made. Blanford was walking away from the officers. He did not turn to confront them. The sword had been in sight from the beginning. Citizens had telephoned the police that the person carrying it had been seen licking it. Blanford's alleged growl did not transform the ancient weapon into an instrument that he, while walking away, was

using to threaten the police. His crime was not severe, it was nonexistent.

*The immediate threat posed to the safety of the officers.* Matthew Blanford posed no immediate threat to the safety of the officers. As the opinion of the court observes, they kept a safe distance away from him. They always had their guns. He had nothing but the sword. He never threatened the police with it.

*Actively resisting arrest.* At no point did Matthew Blanford actively resist arrest.

*Attempting to evade arrest.* Because he did not stop after he was shot, Matthew Blanford could be seen as attempting to evade arrest. The attempt was feeble. He did not accelerate, he did not hide, he stood in his parents' yard and was shot.

Having examined the objective circumstances that *Graham* directs us to, I find no crime, no immediate threat to the officers, no resistance to arrest, and a pathetic if possible attempt to evade arrest. The court says that the case is "difficult." It is indeed difficult to say that a reasonable officer would not have known that he violated Matthew Blanford's constitutional right to life and constitutional right to be free of police violence when the officer gunned him down at short range.

Let me add one further circumstance mentioned in *Garner* that might justify the use of lethal force: *probable cause to believe that the suspect poses a significant threat of death or physical injury to the officer or others.* As glossed by *Graham*, the significant threat must also be immediate. The officers have not been able to name a single human being who was significantly or immediately threatened by Matthew Blanford. What the officers have supplied is speculation: someone might have been in the house, although no one answered the door; someone might have been in a neighbor's backyard if Blanford could have gotten there; Blanford might

have entered the house through the garage, although no one knows whether the garage opened into the house.

Not only is there no evidence that any human person was in significant or immediate danger. The officers knew that Blanford had been walking the streets for some time without harming or endangering anyone. They also knew that a bizarre sword-carrier had been seen before in the neighborhood and had disappeared into it without harm or threat to anyone. So why did they need to use deadly force to restrain Blanford at his parents' doorstep? If imagined persons and imagined emergencies constitute reason to shoot, no community is safe from officers too quickly frustrated and angered by being ignored.

The case is one that demands judgment by the citizens of Sacramento County assembled as a jury, not immunity for the injury-inflicting police.