**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ESTATE OF GABRIEL STRICKLAND; N.S., a minor guardian ad litem Leah Jolley; SHAWNA ALEXANDER, *Plaintiffs-Appellants,* <br><br> v. <br><br> NEVADA COUNTY; SHANNON MOON, Sheriff, Nevada County; TAYLOR KING, Deputy; BRANDON TRIPP, Deputy; JOSEPH MCCORMACK, Officer; CITY OF GRASS VALLEY; ALEX GAMMELGARD, Chief, Grass Valley Police Dept.; BRIAN HOOPER, Officer; DENNIS GRUBE, Officer; CONRAD BALL, Officer; WELLPATH MANAGEMENT INC.; BRENT WELDEMERE; RICHARD DONOFRIO, *Defendants-Appellees.* | No. 22-15761 <br><br> D.C. No. 2:21-cv-00175-MCE-AC <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted February 7, 2023
San Francisco, California

Filed May 31, 2023

Before:  Jay S. Bybee and Patrick J. Bumatay, Circuit
Judges, and Richard D. Bennett,[*] Senior District Judge.

Opinion by Judge Bumatay

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's dismissal for failure to state a claim of an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that police officers used excessive force when they shot and killed Gabriel Strickland, who was known to the officers to be homeless and mentally ill, after he pointed a black toy airsoft rifle in their direction.

The panel held that, under the totality of the circumstances, it was objectively reasonable for the officers to believe that Strickland posed an immediate threat. Construing the facts in the light most favorable to Strickland, he was carrying a replica gun, disregarded

---

[*] The Honorable Richard D. Bennett, United States Senior District Judge for the District of Maryland, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

multiple warnings to drop it, and pointed it at the officers. While the misidentification of the replica gun added to the tragedy of this situation, it did not render the officers' use of force objectively unreasonable.

The panel held that the district court did not abuse its discretion in denying Strickland's estate leave to amend the complaint. The complaint established that Strickland pointed the replica gun's barrel at the officers and so it was objectively reasonable for the officers to respond with lethal force. Under these pleaded facts, it would be futile to allow leave to amend.

## COUNSEL

Patrick H. Dwyer (argued), Patrick H. Dwyer Attorney at Law, Penn Valley, California, for Plaintiffs-Appellants.

Steven J. Renick (argued), Mildred K. O'Linn, Lynn Carpenter, and Kayleigh Andersen, Manning & Kass Ellrod Ramirez Trester LLP, Los Angeles, California, for Defendants-Appellees Nevada County, Shannon Moon, Taylor King, Brandon Tripp, and Joseph McCormack.

John A. Whitesides (argued), Derick E. Konz, and Bruce A. Kilday, Angelo Kilday & Kilduff LLP, Sacramento, California, for Defendants-Appellees City of Grass Valley, Alex Gammelgard, Brian Hooper, Dennis Grube, and Conrad Ball.

Jerome Varanini, Trimble Sherinian & Varanini, Sacramento, California, for Defendants-Appellees Wellpath Management Inc., Brent Weldemere, and Richard Donofrio.

**OPINION**

BUMATAY, Circuit Judge:

When someone points a gun at a law enforcement officer, the Constitution "undoubtedly entitles the officer to respond with deadly force." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). But what if the person points a replica gun that the officer believes is real? In this case, we must examine whether it was objectively reasonable for officers to believe a black toy airsoft rifle pointed in their direction presented an immediate threat justifying the use of deadly force. Based on the facts here, we say yes.

**I.**

On December 26, 2019, Gabriel Strickland was arrested by the Nevada County Sheriff's Office and incarcerated at a correctional facility in Nevada City, California. The Sheriff's Office and Wellpath Management, Inc.—the contractor providing medical services at the facility—performed a physical and mental intake assessment. The evaluation concluded that Strickland needed an urgent mental health evaluation, and they kept him in custody for several days. During this time, officers and Wellpath nurses observed that Strickland had active mental health issues and was uncooperative and angry, though a mental health evaluation was not given.

This was not the first time the Sheriff's Office and Wellpath had encountered Strickland. They had held him in custody at that facility several times before, and a Wellpath doctor had diagnosed Strickland with bipolar disorder, PTSD, and anxiety disorder in 2016. The Sheriff's Office and Wellpath did not refer Strickland to outside providers

for further evaluations and did not involuntarily hold him. And after a pretrial release hearing on December 30, 2019, the Nevada County Superior Court released Strickland.

Two days later, on January 1, 2020, the Nevada County Region Dispatch received reports that a man was walking on a residential road near a neighboring town, Grass Valley, with "what appeared to be a shotgun" slung over his shoulder. A Grass Valley Police Department officer, Officer Conrad Ball, responded to the call and found Strickland on the road. Strickland was carrying a black, plastic airsoft rifle marked with an orange tip, which signified that it was a replica, not a real firearm. Along with Officer Ball, Grass Valley Police Department Officers Brian Hooper and Denis Grube and Nevada County Sheriff's Officers Taylor King and Brandon Tripp arrived on scene. They recognized Strickland and knew he was homeless with mental health issues and had been released from custody days before. As a result, the officers would have known that Strickland was likely suffering from a mental health episode and would not likely respond to their commands in a "normal or expected manner."

The officers maneuvered their patrol vehicles around Strickland and surrounded him with guns drawn. They immediately began yelling at Strickland to "drop the gun!" and "drop the fucking gun!" Strickland held the gun away from his body and said, "It's a BB gun." Strickland then slapped the gun with his hand, making a noise that sounded more like plastic than metal. One of the officers reported to dispatch: "He's saying it's a BB gun." The officers continued to yell commands to "drop the fucking gun, now" and told Strickland "we don't know that's a fake gun." Strickland pointed to the orange tip on the barrel. Officer Tripp responded, "you could have painted that . . . . We

don't want to kill you." Strickland replied, "I'm not doing nothing wrong." Until then, Strickland stood with the barrel pointing at the ground.

The officers did not contact their supervisors for advice or request assistance from other officers with crisis training. They also did not attempt to bring a professional negotiator, crisis de-escalator, or mental health provider to engage with Strickland. Instead, Officer Tripp asked the other officers to cover him and started approaching Strickland with Officers Hooper and Ball. Officers Tripp and Ball had their firearms drawn, and Officer Hooper was armed with a taser. Officer Tripp then told dispatch to "tell Grass Valley [Police Department] units to get out of [the] cross-fire." As the officers approached, Strickland dropped down to his knees.

At this point, Strickland stopped pointing the BB gun at the ground. Strickland began pointing the BB gun in the direction of Officers Tripp, Hooper, and Ball. At other times, he pointed it up toward the sky. In response, Officer Hooper deployed the taser, but it failed to attach and disarm Strickland. Seconds later, after Strickland lowered the barrel toward the officers, Officers Tripp, King, and Hooper opened fire, striking Strickland several times. Strickland was taken to a nearby hospital, where he was pronounced dead.

One year later, Strickland's mother, child, and estate ("Estate") sued on his behalf. The Estate brought excessive force claims against the five police officers, their respective departments, Nevada County, and the City of Grass Valley under 42 U.S.C. § 1983 and state law. It also raised constitutional, federal statutory, and state-law claims against Nevada County, Wellpath, and their personnel for deliberate disregard of Strickland's mental health needs during his

incarceration days before the shooting. The district court dismissed the case under Federal Rule of Civil Procedure 12(b)(6).

The Estate timely appealed. We review the grant of a motion to dismiss de novo, "accepting as true all well-pleaded allegations of material fact and construing them in the light most favorable to the non-moving party." *Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022). Dismissal of a complaint at the 12(b)(6) stage is proper when the plaintiff has failed to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II.

The Fourth Amendment prohibits the unreasonable seizure of persons. U.S. Const. amend. IV. Even if a seizure is reasonable in a particular circumstance, *how* that seizure is carried out must also be reasonable. *Graham v. Connor*, 490 U.S. 386, 395 (1989). So the Fourth Amendment also prohibits the use of excessive force. *Id*. Our "calculus of reasonableness" in these circumstances "must embody allowance for the fact that police officers are often forced to make split-second judgments" and we do not apply the "20/20 vision of hindsight." *Id*. at 396–97. At this stage, our question is whether the officers employed an "objectively unreasonable" amount of force under the "totality of the circumstances." *See Brooks v. Clark County*, 828 F.3d 910, 920, 922 (9th Cir. 2016).

This inquiry requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (simplified). In *Graham*, the Supreme Court looked to several factors: (1) "the type

and amount of force inflicted," (2) "the severity of the crime at issue," (3) "whether the suspect posed an immediate threat to the safety of the officers or others," and (4) "whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) (citing *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)).  But this list isn't exhaustive; we may also consider other relevant factors, such as "the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017).

## A.

Many of the *Graham* factors support Strickland.

Strickland was known to officers as homeless and mentally ill.  At the time of the incident, it was obvious that he was suffering from a mental health crisis.  *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.").

Although officers were responding to reports of a man walking in the neighborhood with a shotgun, Strickland was not under suspicion for committing a serious or dangerous crime.  At the start of the confrontation with police, Strickland had not yet brandished the gun at anyone or threatened the life or property of others.

Furthermore, assuming it's relevant under *Graham*, the officers failed to employ de-escalation techniques.  They did

not wait for supervisors or call in for backup with crisis or mental health training.  In fact, the officers seemingly exacerbated the situation by aggressively shouting directions at Strickland upon their arrival.  *See Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (looking at the officer's role in creating the danger).

And the officers employed "deadly force"—firing several rounds at Strickland and killing him.  *See Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (concluding that "shooting a firearm" is "categorically" deadly force).

So the bulk of the *Graham* factors favor Strickland.  The question is whether the immediacy of the threat that Strickland posed outweighs those considerations here.  We think it does.

## B.

Of all the use-of-force factors, the "most important" is whether the suspect posed an "immediate threat."  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  Because our inquiry is about objective reasonableness, there must be "objective factors" to justify an officer's "fear[] for his safety or the safety of others."  *Deorle*, 272 F.3d at 1281.  In other words, "the objective facts must indicate that the suspect pose[d] an immediate threat to the officer or a member of the public."  *Bryan*, 630 F.3d at 826.  "This analysis is not static, and the reasonableness of force may change as the circumstances evolve."  *Hyde*, 23 F.4th at 870.

While necessarily a fact-bound question with no per se rules, our prior decisions offer some guidance in evaluating the reasonableness of lethal force in response to a threat.  At one end of the spectrum, when a suspect points a gun in an

officer's direction, "the Constitution undoubtedly entitles the officer to respond with deadly force." *George*, 736 F.3d at 838; *see also Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (officer's use of force was justified when "fellow officers radioed that [the suspect] was yelling threats at them and then radioed that [she] was shooting at them"); *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (officers' use of lethal force was not excessive when the suspect held a "long gun and pointed it at them"). So it's well-settled that lethal force is justified if an officer has "probable cause to believe that [a] suspect poses a significant threat of death or serious physical injury to the officer or others." *Long*, 511 F.3d at 906 (simplified).

Reasonableness also doesn't "always require[] officers to delay their fire until a suspect turns his weapon on them." *George*, 736 F.3d at 838. Officers shouldn't have to "wait until a gun is pointed at [them] before [they are] entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838.

At the other end of the spectrum, the Constitution does not tolerate the use of lethal force to "seize an unarmed, nondangerous suspect by shooting him dead" in the absence of probable cause of a threat of serious physical harm. *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). As we've said, it is "clearly established that shooting a nonthreatening suspect would violate the suspect's constitutional rights." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1001 (9th Cir. 2020).

These principles apply even when officers are reasonably mistaken about the nature of the threat. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of" an immediate threat, and "in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). Take the example given by the Court: "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed." *Id*. at 205. Thus, the Constitution even allows for officer's action that resulted from a reasonable "mistake of fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When an officer's "use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Torres*, 648 F.3d at 1124.

Here, the tragedy of Strickland's death was made all the more tragic because it turns out that he was only carrying a plastic, airsoft replica gun. So we are tasked with determining whether the officers reasonably concluded that Strickland was an immediate threat even though he merely possessed a replica gun. In the light most favorable to Strickland, we conclude that the officers' mistaken belief that Strickland possessed a dangerous weapon was reasonable and they were justified in the use of deadly force when he pointed it at them.

As is often the case with officer-involved shootings, officers met a "tense, uncertain, and rapidly evolving" circumstance when they confronted Strickland. *Graham*, 490 U.S. at 397. They found him on a residential street carrying what appeared to be a firearm. The officers remembered Strickland from his prior detentions, and they knew he suffered from mental health issues. Compounding

the situation, as the complaint alleges, his mental challenges were so severe that he was "not likely to respond to directions in a normal or expected manner."  After surrounding him, the officers immediately ordered him to put down the gun.  The officers cautioned Strickland that they did "not want to kill [him]" and repeatedly yelled at him to "drop the gun."  Strickland did not comply.  Instead, while pointing the replica gun's barrel at the ground, he explained, "I'm not doing nothing wrong."

After continued warnings, three officers approached Strickland with their firearms drawn.  Strickland dropped to his knees, continuing to hold the gun.  Strickland then began pointing the replica gun in the direction of the approaching officers.  One officer tried tasing Strickland but failed to disable him.  A few second later, the three officers fired on Strickland, striking him several times and killing him.  The whole encounter from start to finish lasted a little more than three minutes.

The pivotal moment occurred when Strickland began pointing the replica gun in the officers' direction.  At that point, they had "probable cause to believe that [Strickland] pose[d] a significant threat of death or serious physical injury" to themselves and it became objectively reasonable for them to use lethal force.  *Garner*, 471 U.S. at 3.  As we've said, when a suspect points a gun in the direction of officers, they would be justified to use deadly force.  *See George*, 736 F.3d at 838.

This analysis doesn't change because the weapon turned out to be a replica given the officers' reasonable belief that Strickland possessed a real firearm.  They were called to the scene based on reports of a man walking down a residential street with what appeared to be a shotgun.  When officers

arrived, they saw Strickland armed with the black replica gun—as with all replicas, it was presumably intended to look like a real firearm. According to the complaint, from its appearance, the only indication that the replica was not real was its orange-painted tip. Although Strickland tried to convince officers that the object was "a BB gun," even slapping it to make a plastic sound, officers disbelieved him. They responded, "we don't know that's a fake gun" and suggested that Strickland "could have painted" the orange tip. The officers were reasonably justified in not taking Strickland's assurances at face value. *Cf. Blanford v. Sacramento County*, 406 F.3d 1110, 1116 (9th Cir. 2005) (finding it objectively reasonable for officers to attempt to "secure the weapon first" when confronting a suspect who might be "mentally disturbed or under the influence of a controlled substance"). After all, misplaced trust in this circumstance could be fatal for the officers.

We note that the facts here differ significantly from other cases when we've held it unreasonable for officers to use lethal force when encountering a replica or toy gun. In *Nicholson v. City of Los Angeles*, 935 F.3d 685 (9th Cir. 2019), for example, we denied qualified immunity to an officer who shot a suspect with a similar plastic, orange-tipped airsoft gun, but we did so because of the officer's failure to deliberate. *Id*. at 693. In that case, the officer saw a group of teenagers in an alley with what looked like a gun. *Id*. He immediately ran down the alleyway without consulting his partner and fired his weapon toward the suspect, ultimately striking an innocent bystander. *Id*. We did not find it dispositive that the gun turned out to be a "toy"; instead, it was conclusive that the officer did not see the suspect "point it at anyone" and nothing suggested the

suspect "was likely to harm anyone." *Id*. at 694. So our decision didn't hinge on the misidentification of the gun.

Likewise, this case differs from *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017). In that case, whether a suspect with a toy gun posed an "immediate threat" was in dispute, which precluded qualified immunity at summary judgment. *Id*. at 1011, 1023. There, an officer saw a teenager walking with a toy gun, which looked like an AK-47. *Id*. at 1010. The officer yelled at the teenager to "drop the gun" one time from behind. *Id*. As the teenager was turning toward the officer, the officer fired eight shots in quick succession at him. *Id*. at 1003. And the parties disputed key facts: whether "the gun was pointed straight down at the ground, [whether] the barrel . . . rose at any point to a position that posed any threat to . . . the officer," and "if [the teenager's] finger was on the trigger." *Id*. at 1010–11. Once again, our decision didn't turn on the mistaken identification of the gun. Rather, we determined that a reasonable jury could conclude that the teenager did not pose an immediate threat and that the use of deadly force was not objectively reasonable. *Id*. at 1011.

Here, under the totality of the circumstances, it was objectively reasonable for the officers to believe Strickland posed an immediate threat. In the light most favorable to Strickland, he was carrying a replica gun, disregarded multiple warnings to drop it, and pointed it at the officers. *Cf. County of Los Angeles v. Mendez*, 581 U.S. 420, 425–26 (2017) (observing that the Ninth Circuit held that a shooting of a person with a BB gun was reasonable given the officers' belief that the individual had a gun and was threatening them while reversing on other grounds). While the misidentification of the replica gun adds to the tragedy of

this situation, it does not render the officers' use of force objectively unreasonable.

The Estate argues that the excessive force claim cannot be adjudicated at the Rule 12(b)(6) stage because of the fact-intensive nature of this inquiry.  We disagree.  At the 12(b)(6) stage, we take the Estate's well-pleaded factual allegations as true and construe them in Strickland's favor. *See Hyde*, 23 F. 4th at 869.  But even under this favorable standard, the Complaint establishes that it was objectively reasonable for the officers to perceive an immediate, deadly threat, permitting them to employ lethal force in their own defense.  The Estate pleads that Strickland was carrying a toy gun that resembled a real firearm, that he ignored multiple commands to drop it, and that he pointed it at the officers during a tense confrontation.  When he did so, the officers were left with only an instant to act.  They were not required to "delay their fire" until they learned whether the gun was real.  *George*, 736 F.3d at 838.  Given the immediacy of the threat presented by these allegations, the Estate cannot state a plausible claim for excessive force, regardless of whatever additional facts Strickland might allege.

Because we agree with the district court that Strickland's Estate failed to state an excessive force claim, we do not address Appellees-Defendants' qualified immunity arguments.

### C.

We also hold that the district court did not abuse its discretion in denying the Estate leave to amend the complaint.  "Although a district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations, dismissal without

leave to amend is proper if it is clear that the complaint could not be saved by amendment." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (simplified). We grant the district court "particularly broad" discretion to deny leave to amend when the plaintiff has already had a chance to amend, as here. *Id*.

The Estate argues that it should be given another chance to amend the complaint. It contends that the exchange of discovery could reveal additional evidence about the circumstances of Strickland's shooting and the use of lethal force. But pleading standards must be met before "unlock[ing] the doors of discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Here, the complaint establishes that Strickland pointed the replica gun's barrel at the officers and so it was objectively reasonable for the officers to respond with lethal force. *See Long*, 511 F.3d at 906. Under these pleaded facts, it would be futile to allow leave to amend. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

## IV.

We can all agree that the circumstances of Gabriel Strickland's death are tragic. But under the facts alleged, the officers' use of lethal force was objectively reasonable under the totality of the circumstances. Thus, the Estate's excessive force claim was properly dismissed. *See Graham*, 490 U.S. at 396–97. While the Estate did not offer specific arguments challenging the district court's dismissal of its other claims, it concedes that those causes of action are tied to the excessive force claim. As a result, we affirm the dismissal of all claims against all Appellees-Defendants.

**AFFIRMED.**