Irwin FOSTER, et al., Plaintiffs,

v.

CITY OF FRESNO, et al., Defendants.

No. CVF035306RECSMS.

United States District Court,
E.D. California.

July 12, 2005.

Hunter Pyle, Sundeen Salinas Romell & Pyle, Oakland, CA, for Plaintiffs.

Harvie Ruth Schreiber, City of Fresno, James Darvin Weakley, Rosemary Therese McGuire, Erica Mercado Camarena, Weakley, Ratliff, Arendt & McGuire, LLP, Fresno, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

COYLE, District Judge.

On April 4, 2005, the Court heard Defendants' motion for summary judgment or, in the alternative, for summary adjudication of certain issues. Upon due consideration of the written and oral arguments of the parties and the record herein, Defendants' motion is GRANTED as set forth below.

## I. Factual Background [1]

This case centers around the death of Eric Daniel Foster ("Foster"), who was shot and killed by Fresno Police Department Officer Russell Cornelison. Plaintiffs are Foster's parents, Irwin Foster and Anna Valles, and Foster's minor children and surviving heirs at law, Eric Daniel Foster, Jr. and Gloria Emonie Foster, appearing by and through their guardian ad litem.

On August 15, 2002, Foster was shot and killed by Officer Cornelison. In the hours immediately preceding the shooting, there were four separate armed robberies in Fresno. All four victims indicated that the perpetrator was a black man with a gun who was in a white Chevrolet pick-up truck. Two of the four victims subsequently identified Foster from a photo line-up, and another victim's wallet was found in Foster's vehicle. The robberies were reported to the police shortly after they occurred.[2]

---

1. The facts are taken from Defendants' Statement of Undisputed Material Facts ("UMF") unless otherwise noted.

2. Defendants submitted a detailed factual background that set forth the specifics of the robberies. Plaintiffs do not dispute these facts but argue that, for purposes of summary judgment, they are immaterial and prejudicial because there is no indication that Officer Cornelison knew these facts at the time of the shooting. The Court agrees and has thus omitted these details. Plaintiffs' objection is sustained.

At approximately 2:40 a.m. on August 15, police broadcasts over the radio informed patrol officers the suspect of the armed robberies was a black male, wearing a dark, hooded sweatshirt and driving a white truck. Officer Mike Roberts was traveling in his patrol unit when he saw a white truck matching the description of the suspect's vehicle. The truck did not have its lights on and the officer was able to observe that the driver appeared to be a black male in a hooded sweatshirt.

The officer followed the truck but did not turn on his siren lights. The suspect's vehicle ran through a red light and collided with a red car carrying two passengers. The suspect's vehicle flipped over and landed on its roof.

The suspect, later identified as Foster, climbed out of the overturned truck and began to run. Officer Roberts shined his spotlight on Foster and ordered him to stop. Foster ran towards a bush on the side of the street and Officer Roberts heard the sound of a chain link fence rattling as he continued to order Foster to surrender.

Foster came out from behind the bush for a brief period, during which his hands were on his waist with the tips of his fingers toward his pockets. Officer Roberts thought Foster was reaching for a gun, but did not fire on him because he felt Foster was too far away to hit. Foster climbed the fence and ran into an orchard. Officer Roberts broadcast over the radio that Foster had fled on foot.

Officer Roberts returned to the overturned truck and looked through an open window into the interior of the cab, looking with a flashlight for the gun that had been reportedly used in the robberies. Seeing none, Officer Roberts then broadcast over the radio that he was unable to find the gun and that the suspect might still be armed. Assisting units arrived on the seen and Officer Ryan Engum conducted a second visual inspection of the truck, also using a flashlight. He was unable to locate a gun and also announced his search results over the radio. Later, when the truck was turned over and more thoroughly searched, a handgun was found.

Officers Russell Cornelison, Skye Leibee and Ezequiel Suarez, who had been monitoring the radio frequency and learned of the armed robberies, arrived at the scene to offer assistance. They were informed that the robbery suspect had fled on foot into the orchard and that he had possibly removed and discarded the sweatshirt he was wearing.

The officers divided into two teams to search the orchard. Officer Cornelison with his canine partner, a Belgian Malinois named Saxon, as well as Officer Suarez and Officer Leibee formed one team. The officers were all aware that the suspect in the series of robberies had been armed with a handgun and that a search of the vehicle did not reveal a gun.

As the three officers proceeded into the orchard they traveled north along a dirt road with orchard trees to the left and a six foot fence covered with ivy to their right. Officer Cornelison led the team with Saxon in front. Officer Leibee was directly behind him providing cover and Officer Suarez was behind Officer Leibee, also providing cover.

Shortly after the search of the orchard began, Saxon alerted Officer Cornelison to the northeastern corner of the orchard where they located the suspect hiding in the bushes along the fence. Because it was dark, Officer Cornelison shined his flashlight on the suspect, who had his back towards the officers. Officers Cornelison and Leibee identified themselves as police and commanded several times that the suspect show his hands. The suspect, Foster, refused to comply. Officer Corne-

lison warned Foster that if he did not comply, the dog would be released.

Canine Saxon began to bark and Foster still refused to comply. Believing the suspect was armed with a gun allegedly used in the preceding robberies, Officer Cornelison released Saxon with two commands, to bite the suspect and to bring him to Officer Cornelison. Officer Cornelison then retrieved his department handgun, held it with both hands and pointed it at Foster. Officers Leibee and Suarez maintained cover behind Cornelison.

Saxon bit Foster on his lower back and initially Foster did not move or react to the dog biting him. Officer Cornelison continued to give Foster commands to show his hands and come out but Foster did not respond, even after being bitten.

The parties do not dispute the facts to this point. There is, however, a dispute as to what transpired immediately prior to the shooting. These facts will be discussed in more detail below. What is undisputed is that Officer Cornelison discharged his weapon and shot Foster four times. Foster, who was unarmed, died as a result of the multiple gunshot wounds.

An autopsy was conducted by Dr. Gopal of the coroner's office. The toxicology report indicated that Foster's blood tested positive for PCP and cannibinoids and that the urine test confirmed those results and revealed the presence of a cocaine metabolite.[3]

## II. Procedural History

Plaintiffs filed their complaint on March 12, 2003. A first amended complaint was filed on July 23, 2003 and a Second Amended Complaint ("SAC") was filed by stipulation of the parties on November 6, 2003. The SAC names as Defendants the City of Fresno; City of Fresno Police Chief Jerry Dyer in his individual capacity; and City of Fresno Police Officer Russell Cornelison, also in his individual capacity.

The SAC states nine causes of action.[4] The first three arise under 42 U.S.C. § 1983. Claim one is by all Plaintiffs except Valles on behalf of Foster against Officer Cornelison and is based on violations of Foster's Fourth and Fourteenth Amendment rights. Claim two is by all Plaintiffs on their own behalf against Cornelison and is based on violations of their rights under the Fourth and Fourteenth Amendments, including a Fourteenth Amendment right to be free of governmental influence with familial relationships. Claim three is by all Plaintiffs on their own behalf and on behalf of Foster and is against Defendants City and Dyer. It is based on the policies and customs of the City and Dyer to use, promote, or tolerate excessive force; ignoring and failing to investigate alleged abuses; and failure to adequately discipline and train.

Claim four is under state law and is brought by all Plaintiffs except Valles against all Defendants. It asserts a violation of Plaintiffs' rights under the California Constitution and alleges that Defendants acted in concert to do so. The remaining causes of action also arise under California law and are brought by all Plaintiffs except Valles on behalf of themselves and Foster. The fifth and sixth claims are against Defendant Cornelison only and are for intentional and negligent wrongful death, respectively. Claim seven is against Defendant Cornelison and

---

**3.** The Court agrees with Plaintiffs that this information is irrelevant to the extent it was unknown to Officer Cornelison.

**4.** The SAC includes allegations regarding violations of the First, Fifth and Ninth Amendments, however these allegations were voluntarily withdrawn per stipulation. *See* Doc. 36.

the City and is for violation of Foster's civil rights under California law, Civil Code section 52.1. Claim eight is against Defendant Cornelison and is for intentional infliction of emotional distress. Claim nine is against Defendant Dyer and the City and is for negligent hiring, retention, training supervision and discipline.

Defendants moved for summary judgment. Defendants argue that Plaintiffs Irwin Foster and Anna Valles lack standing to assert a survival action, that Plaintiffs' lack sufficient evidence to demonstrate an unconstitutional policy or practice on the part of the City or Defendant Dyer, that Defendant Cornelison's use of force was objectively reasonable and that he is entitled to qualified immunity.

## III. Legal Standard

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Materiality is determined by the substantive law governing a claim or a defense. *Id.* The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party. *Id.*

The initial burden in a motion for summary judgment is on the moving party. The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to defeat summary judgment. *T.W. Elec.,* 809 F.2d at 630.

The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id.* (citing Fed.R.Civ.P. 56(e)). The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id.* (citing *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The question for the Court is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position;" there must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *Id.*

## IV. Unopposed Issues

### A. Standing of Plaintiffs Irwin Foster & Anna Valles

 The survivors of an individual who is killed as a result of the application of excessive force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. *Moreland v. Las Vegas Metropolitan Police Dept.,* 159 F.3d 365,

369 (9th Cir.1998). Section 377.60 of the California Code of Civil Procedure provides that a wrongful death action may be asserted by a the children of a decedent. Cal.Code Civ. Pro. § 377.60(a). A parent may only assert a wrongful death claim if there are no children or issue or if he or she is "dependent on the decedent." *Id.* at § 377.60(b). "Dependence" refers to financial rather than emotional dependency. *Perry v. Medina,* 192 Cal.App.3d 603, 608–09, 237 Cal.Rptr. 532 (1987). To demonstrate financial dependence, a parent "must show that they were actually dependent, to some extent, upon the decedent for the necessaries of life." *Id.* at 610, 237 Cal.Rptr. 532.

Plaintiffs do not attempt to refute Defendants' evidence establishing that Foster did not provide any financial support for Irwin Foster. Defs.' UMF Nos. 90–97. At oral argument on the motion, Plaintiffs' counsel conceded the standing issue with respect to claims on behalf of Foster.[5]

Accordingly, because Plaintiffs have offered no evidence that either Valles or Irwin Foster were financially dependent on Foster, neither of them has standing to assert claims on behalf of Foster. Summary judgment is GRANTED in favor of Defendants as to this issue. This eliminates Plaintiff Irwin Foster from all claims except the second and the fourth and eliminates Plaintiff Valles from all claims except the second.

## B. Liability of Defendants Dyer & the City of Fresno

### 1. The Section 1983 Claim (Claim Three)

"Plaintiffs do not contest defendants' motion for summary judgment on the third cause of action." Pls.' Opp'n at 31. This is the section 1983 claim. Summary judgment as to this claim is GRANTED in favor of Defendants Dyer and the City of Fresno.

### 2. Negligent Hiring, Retention, Training, Supervision & Discipline (Claim Nine)

■ A claim for failure to train requires a legal duty to use due care, breach of that duty and that the breach be a proximate or legal cause of the injury. *Stuart v. United States,* 797 F.Supp. 800, 804 (C.D.Cal. 1992). Defendants argue that Plaintiffs have provided no evidence that supports this claim.[6]

■ Plaintiffs do not address claim nine in their opposition, and at oral argument on the motion, counsel for Plaintiffs acknowledged Plaintiffs' non-opposition.[7] Accordingly, summary judgment as to

---

**5.** Plaintiffs correctly point out in their opposition that the Ninth Circuit has recognized that a parent who claims loss of companionship as the result of the application of excessive force can bring a claim under the Fourteenth Amendment. *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325, (9th Cir.1991) *cert. denied* 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992); *Strandberg v. City of Helena,* 791 F.2d 744, 748 (9th Cir.1986). However, this does not address Defendants' point that, as parents, Valles and Irwin Foster cannot assert claims on behalf of Foster.

**6.** Defendants' citation to *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 840 (9th Cir.1996), is inapposite. *Van Ort* supports the theory that if a public employee is acting outside the scope of his employment, which cannot be argued here, there can be no negligent supervision claim against the employing entity.

**7.** At any rate, failure of a party to address a claim in an opposition to a motion for summary judgment may constitute a waiver of that claim. *See Coufal Abogados v. AT&T, Inc.,* 223 F.3d 932, 937 (9th Cir.2000); *Doe v. Benicia Unified Sch. Dist.,* 206 F.Supp.2d 1048, 1050 n. 1 (E.D.Cal.2002).

claim nine is GRANTED in favor of Defendants Dyer and the City of Fresno.

## C. Liability Based on Violation of Plaintiffs' Fourth Amendment Rights (Claim Four)

■ Claim four asserts a violation of Plaintiffs' rights to be free of excessive force and unreasonable seizure under Article 1, section 13 of the California Constitution, the state law equivalent of the Fourth Amendment. Compl. ¶ 50. Defendants argue that Plaintiffs lack evidence to support a violation of their own, personal Fourth Amendment rights.

At oral argument on the motion, Plaintiffs conceded that there is no evidence to support a Fourth Amendment cause of action based on the rights of Plaintiffs. However, as discussed, Plaintiffs Eric Foster, Jr. and Gloria Foster, Foster's surviving children, may assert claims on behalf of Foster for the alleged violation of Foster's rights. Accordingly, summary judgment as to claim four is GRANTED in favor of Defendants.

## V. Liability of Officer Cornelison [8]

The parties divide their arguments regarding Officer Cornelison into two questions, a constitutional question and a qualified immunity question. These two questions both fall under the rubric of qualified immunity.

■ The doctrine of qualified immunity promotes public service by eliminating the risk of personal liability for official decisions. *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Qualified immunity is not a defense on the merits; it is an "entitlement not to stand trial or face the burdens of litigation." *Saucier v. Katz,* 533 U.S. 194, 200–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). It may be overcome only by a showing that (1) a constitutional right was in fact violated and (2) no reasonable officer could believe the defendant's actions were lawful in the context of fact-specific, analogous precedents. *Id.*

There is some contradiction with respect to the policies at issue in an excessive force case involving qualified immunity. On the one hand, the Ninth Circuit has stated that, due to the fact-intensive nature of the inquiry, summary judgment "in excessive force cases should be granted sparingly." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir.2002). On the other hand, the Supreme Court has stressed the importance of immunity being resolved at an early stage in the litigation. *Saucier,* 533 U.S. at 200–201, 121 S.Ct. 2151.

## A. Were Foster's Constitutional Rights Violated?

### 1. Legal Standard

■ The threshold question in determining the question of qualified immunity is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" [9] *Saucier,*

---

8. Defendants are entitled to summary judgment as to the portion of Plaintiffs' section 1983 claim on behalf of Foster that is based on the Fourteenth Amendment. The Supreme Court has held that excessive force cases are to be evaluated under the Fourth Amendment rather than the Fourteenth. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

9. Although the term "alleged" is used, the Ninth Circuit recently upheld a grant of summary judgment based on the determination of the constitutional violation question. *Blanford v. Sacramento Co.,* 406 F.3d 1110 (9th Cir.2005) (finding officers' actions not objectively unreasonable).

533 U.S. at 201, 121 S.Ct. 2151. In the case of disputed facts, their resolution and any credibility determinations "are manifestly the province of a jury." *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir.2002).

▋ "[C]laims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard." *Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583, 589. This question "is governed by the principles enunciated in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), and *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)." *Id.* at 598–99.

▋ With respect to deadly force, the Court has explained that "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.' But '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force.'" *Id.* (citations omitted). The "broad discretion that must be afforded to police officers who face a tense situation," must be extended to mistakes of fact concerning "the existence of probable cause" as well as to mistakes as to what the law requires under particular circumstances. *Jeffers v. Gomez,* 267 F.3d 895, 909 (9th Cir.2001).

▋ Reasonableness is an objective analysis and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865 (citations omitted).

▋ *Graham* set forth factors that should be considered in determining reasonableness: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner,* 471 U.S. at 8–9, 105 S.Ct. 1694 ("the question is whether the totality of the circumstances justifie[s] a particular sort of ... seizure") (quotations omitted)); *see also Billington v. Smith,* 292 F.3d 1177, 1184 (9th Cir.2002). The most important of these factors is the threat posed by the suspect. *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir.2005).

The Ninth Circuit has admonished courts to use caution in cases such as this:

Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

*Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) (citations omitted).

On a motion for summary judgment, the question is thus whether there is a genuine issue of material fact regarding whether Officer Cornelison's conduct was objectively reasonable in light of the facts and circumstances with which he was confronted. If there is not, then no constitutional right was violated and Officer Cornelison is immune from suit. If there is a genuine issue of material fact, the constitutional violation is assumed and the next question is whether the right was clearly established at the time.

### 2. The *Graham* Factors

The force used by Officer Cornelison consisted of the use of the canine Saxon and the use of his firearm. Defendants argue that Officer Cornelison's actions were objectively reasonable based on the information he had at the time and that it was proper for him to release Saxon and use deadly force.

Plaintiffs do not argue that the use of Saxon was unreasonable. Plaintiffs argue that on their version of the facts, Officer Cornelison's use of deadly force was not objectively reasonable. To summarize, Plaintiffs argue that Foster had emerged from the bushes and had turned such that Officer Cornelison should have seen that Foster was unarmed. Plaintiffs also assert that there are disputes as to the motion made by Foster and the positions of either Officer Cornelison or Foster at the time of and during the shooting.

#### a. Severity of the Crime

It is undisputed that four armed robberies occurred on the night in question, that Foster was identified by two of the victims and that physical evidence connected him to a third. Defs.' UMF Nos. 10, 16, 26. It is also undisputed that Officer Cornelison was aware that at least a couple of robberies had occurred and that the officers were pursuing the suspect in those cases. Defs.' UMF Nos. 64–65. It is also undisputed that Foster ran a red light and crashed his truck into another vehicle. Defs.' UMF No. 46. Reckless driving can be a dangerous crime, and armed robbery is unarguably a serious and dangerous crime; the severity of the crime here is significant.

#### b. Attempting to Evade Arrest

It is undisputed that Foster fled from the scene of the car accident into the orchard. Defs.' UMF No. 57. It is likewise undisputed that when the officers located Foster he was crouched near a foliage-covered fence in the orchard. Defs.' UMF Nos. 70, 72. Foster had been attempting to evade arrest at the time of the shooting.

#### c. Resisting Arrest

Foster did not respond to the repeated commands of the officers to come out and raise his hands. Defs.' UMF No. 73. Foster initially did not move or react to being bitten by Saxon, Defs.' UMF No. 79, and he did not respond to Officer Cornelison's continued commands to show his hands and come out. Defs.' UMF Nos. 80–81. Foster was resisting arrest in that he was being non-compliant with the officers' orders to surrender.

#### d. Immediate Threat Posed by Foster

As mentioned, this is the most important of the *Graham* factors. *See Smith,* 394 F.3d at 702.

#### (1) Officer Cornelison Reasonably Believed Foster Was Armed

 Plaintiffs do not dispute that "[a]ll the officers were aware through radio traffic that the suspect in a series of preceding robberies was armed with a handgun and that a search of the vehicle revealed no

gun." Defs.' UMF No. 69. Plaintiffs also do not dispute that Officer Cornelison released Saxon "[b]elieving the suspect was armed with the gun he used in the preceding robberies...." Defs.' UMF No. 76. Accordingly, the undisputed facts establish that, at the time of the shooting, Officer Cornelison believed Foster was armed.

Plaintiffs' police procedures expert, Frank Saunders, concluded that the officers' actions were inconsistent with the tactics to be used in confronting an armed and dangerous suspect, and thus the actions undermine Officer Cornelison's assertion that he believed Foster was armed and dangerous. Pls.' Opp'n at 16–17. Two of the five reasons given by Mr. Saunders relate solely to the actions of Officers Suarez and Leibee and are not relevant to the question of whether Officer Cornelison's actions were objectively reasonable. The other three points are unsupported by the evidence and are addressed in turn below.

Mr. Saunders asserts that Officer Cornelison's "seems to have acted with total disregard for the safety of Saxon," and that Officer Cornelison's use of the canine was contrary to national police procedure standards. Defendants argue properly that this conclusion lacks foundation. Mr. Saunders has never been a canine officer and has no training with respect to handling canines. Saunders Depo. 27: 4–18. Nor does Mr. Saunders specify what the "national police standards" are for use of a canine. Further, it is undisputed that Mr. Saunders received a copy of the Fresno Police Department's canine policies and has no criticisms thereof. Defs.' UMF NO. 108. That Saxon may have been put at risk is immaterial to whether Officer Cornelison believed Foster was armed. Moreover, Officer Cornelison explained that a canine may be used in a situation in which it would be inappropriate to use a human officer. Cornelison Depo. 40:17–24.

Mr. Saunders' second assertion is that Officer Cornelison acted inconsistently with "national officer safety police procedures" because he failed to establish that his fellow officers were covering him when he approached Foster. Saunders Decl. ¶ 9B. Again, Defendants properly object because the national police standards are unspecified. Also, it is undisputed that Officers Leibee and Suarez were providing cover throughout the operation. Defs.' UMF Nos. 71, 78.

Mr. Saunders' third assertion is that Officer Cornelison acted inconsistently with "national standard police procedures" as well as "(law enforcement) common sense" when Officer Cornelison approached Foster without attempting to take cover. Defendants again properly object to the unspecified national standards. Defendants also argue that Officer Cornelison explained that he "did not want to take [his] eyes off the suspect or put [his] back to [the suspect]." Additionally, Officer Cornelison testified that he believed Foster was "giving up" when Foster raised his hand but that he, Officer Cornelison still believed Foster was armed. Cornelison Depo. 82:7–10.

Even if Mr. Saunders' conclusions were not lacking in foundation, it remains undisputed that the officers were aware via radio communications that Foster had been armed with a gun and that a search of his vehicle did not reveal a gun. Moreover, the Ninth Circuit has held that, "even for summary judgment purposes, 'the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable.'" *Billington, supra* 292 F.3d at 1189 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)).

### (2) Foster's Position Prior to the Shooting

According to Officer Cornelison, after Saxon began biting Foster the next thing Foster did was look back over his right shoulder toward the officers and raise his right hand. Cornelison Decl. ¶ 27; Leibee Decl. ¶ 24; Suarez Decl. ¶ 22. Officer Cornelison then took "at least a couple" of steps toward Foster such that he was approximately 10–15 feet away from Foster. Defs.' UMF No. 83. Officer Cornelison testified that Saxon was not able to pull Foster from the foliage and that there was "[j]ust a little [movement] from the shaking from the dog maybe, but no major movement." Cornelison Depo. 77:4–5.

In contrast, Plaintiffs assert that Saxon was successful in extracting Foster from the bushes, Suarez Depo. 46:4–11, and argue that this undermines Officer Cornelison's claim that he could not see Foster's hands. Officer Suarez, who was providing cover for his fellow officers and monitoring the orchard during the incident, testified as follows:

Q. Okay. And did you see Mr. Foster move at all after the dog bit him?

A. Initially, no. I believe a little later. I don't know if the dog may have brought the subject out slightly from the foliage, I'm not sure how much, but movement was very little.

Q. So before the shots were fired, you think the dog pulled Mr. Foster out from the foliage?

A. To the best of my recollection, yes, I believe so.

Q. How far away from the foliage did the dog pull Mr. Foster out before the shots were fired?

A. I don't remember.

Suarez Depo. 46:2–14.

Defendants, citing only the first question and answer, assert that Plaintiffs have taken Officer Suarez's testimony out of context and that it "in no way indicates that Saxon was successful in removing Foster from the bushes." Defs.' Reply at 4. When read in its totality, Officer Suarez's testimony that he believed Saxon pulled Foster from the foliage is inconsistent with Officer Cornelison's testimony that Saxon was not able to pull Foster from the foliage. This fact is disputed and will be viewed in the light most favorable to Plaintiffs. However, even assuming Saxon was able to pull Foster from the bushes, this evidence does not indicate that Foster turned toward the officers so that his hands were visible. Indeed, Officer Suarez indicated that immediately after he thought Foster had been pulled from the bushes, he could not see Foster's hands. Suarez Depo. 46:22–23. To that extent, the testimony of the two officers is consistent and does not create a genuine issue of material fact.

### (3) Foster's Movement Prior to the Shooting

Defendants argue that the following is an undisputed material fact:

84. After looking at the officers, Foster immediately turned, put his head down and jammed his hand back down to his waist or crotch area, began fumbling around, jerking his arm as if he was trying to grab something.

[Evidence] 84. Declaration of Russell Cornelison at ¶ 29; Declaration of Skye Leibee at ¶ 24.

Defs.' UMF No. 84. Plaintiffs argue that this fact is disputed as follows:

Neither Officer Leibee nor Officer Suarez, both of whom had clear, unobstructed views of Mr. Foster, saw Mr. Foster fumble around or jerk his arm as if he was trying to grab something.

Furthermore, it is undisputed that Mr. Foster was unarmed at the time of the shooting. Accordingly, there would

have been no reason for him to fumble around or jerk his arm.

[Evidence] Deposition of Skye Leibee, Exh. B to Pyle Decl., at 41:5–7; 42:3–13; 45:13–16; 50:13–22; Deposition of Ezequiel Suarez, Exh. C to Pyle Decl., at 49:2–22.

Officer Suarez, who, as mentioned, was dividing his attention between monitoring the orchard for threats and the scene involving Foster, testified in his deposition as follows:

Q. How did Mr. Foster move?

A. I don't know if he moved his arm—it appeared that he moved his arm forward and he kind of moved his body in a forward motion.

Q. Which arm did Mr. Foster move forward?

A. I believe it was the right, right one. He started moving it, and I[sic] that's when I had immediately turned around.

. . . . .

Q. Did Mr. Foster put his right arm out away from him as though he was trying to steady himself or catch his balance?

A. It did not appear to me that he did. It looked like he was moving his hand forward.

Q. And did it look to you like Mr. Foster was trying to retrieve a weapon of some kind?

A. I'm not sure what he was trying to do, because I immediately turned around to look at the orchard.

Suarez Depo. 47:24–25, 48:1–6, 48:22–25, 49:1–6. This evidence is not inconsistent with Officer Cornelison's testimony and does not, without more, constitute an issue of fact.

Officer Leibee, who was providing cover for Officer Cornelison, testified in his deposition as follows:

Q. Did Mr. Foster move any part of his body that you could see?

A. Yes.

Q. What part of his body did he move?

A. It was his right hand.

Q. And what did Mr. Foster do with his right hand?

A. *It momentarily came out from where it was concealed at,* and it appeared to me like he was trying to rebalance himself, *and then it went back down.*

Q. And could you see what Mr. Foster was doing with his right hand after he brought it back down?

A. No.

. . . . .

Q. And was there anything about his motion that made you think he was trying to keep his balance?

A. Just the motion that he made, it appeared to me like he was trying to regain his balance. It wasn't—he didn't put his hands up in the air like he was giving up. Like I said, it was just something that looked like he was trying to regain his balance.

Leibee Depo. 40:20–25, 41:1–7, 42:23–25, 43:1–4 (emphasis added).

It is undisputed that Foster moved his arm up and then moved it back down, although there is a dispute as to why Foster raised his arm. Officer Leibee interpreted the motion as an attempt by Foster to regain his balance, Leibee Depo. 43:1–4, while Officer Cornelison believed that Foster was complying with the commands to raise his hands. Cornelison Depo. 77:13–15. This dispute is immaterial. Neither officer indicated that they thought the raising motion was threatening; it was the downward motion that caused Officer Cornelison to fire.

Accordingly, although there is some dispute as to whether Foster "jammed" his hands toward his crotch area, which will be

addressed in the next section, it is undisputed that Foster raised his right arm up and then lowered it again.

### (4) Foster's Putting His Arm Back Down

Defendants argue that the movement of Foster's arm was threatening and that Officer Cornelison reasonably believed that Foster was reaching for a weapon and applied deadly force in response. Defendants argue that Officer Cornelison felt he was under immediate threat and shot Foster to stop the threat. Defs.' UMF No. 85 (disputed by Plaintiffs). Officer Leibee also testified that Foster's "[p]utting his hand back down into his waistband or near his waistband area" was "threatening." Leibee Depo. 44:18–24.

Plaintiffs assert that there is a dispute as to whether Officer Cornelison saw Foster fumbling around as though for a weapon. Plaintiffs make three points with respect to this.

Plaintiffs argue first that Officer Suarez's actions undermine both Officer Cornelison's and Officer Leibee's descriptions of Foster's movement as threatening. Plaintiffs assert that the movements were "so non-threatening that Officer Suarez, after seeing them, diverted his attention to the orchard to look for other signs of danger." Pls.' Opp'n at 18. Plaintiffs misconstrue Officer Suarez's actions and testimony. Officer Suarez explained that he turned to look at the orchard, which he was responsible for covering, because he thought he heard a noise, not because the movement was non-threatening. Suarez Depo. 47:17–23. Notably, Officer Suarez testified that he turned around "while I was advising dispatch that it appeared the subject was reaching for something." *Id.* at 47:21–23. Accordingly, the testimony of Officer Suarez, if anything, supports Officer Cornelison's determination that Foster was reaching for something and does not create an issue of material fact.

Plaintiffs argue second that neither Officer Leibee nor Officer Suarez saw Foster "jam" his hand down or fumble around for anything. Plaintiffs are correct that neither officer described Foster's movement in this way although, as mentioned, Officer Leibee described the movement as "threatening" and Officer Suarez testified that he advised dispatch that Foster was reaching for something. The descriptions of Officers Leibee and Suarez are not entirely consistent with that of Officer Cornelison.

Plaintiffs argue third that it is implausible that Foster was fumbling around for something because Foster was actually unarmed and that there was no reason for him to fumble around. Defendants argue in response that Foster was not aware that he had lost the gun that he had previously possess and was therefore searching for it. This particular question—whether to believe that, in the time between Foster's fleeing the scene of the car accident and his discovery by the officers Foster realized he did not have his weapon, and thus Plaintiffs' version of the facts is the credible one; or whether Foster, who was under the influence of controlled substances, did not realize that he had lost his weapon and was reaching for it, thus supporting Defendants' version of the facts would be a question of fact for a jury.

Again, viewing the facts in the light most favorable to Plaintiffs, Plaintiffs' second and third points indicate a dispute as to whether Foster jammed his hand down and fumbled around as if reaching for a weapon or whether he simply moved his hand down without fumbling. The Court will assume for the purposes of this motion that no fumbling or jamming occurred.

### (5) Failure of Officer Leibee to Fire

It was immediately after Foster moved his arm that Officer Cornelison fired his weapon. As he did so, Officer Cornelison stepped into Officer Leibee's line of fire. Leibee Depo. 46:24–25; 47:1–2. Officer Leibee testified that he immediately moved to his right and regained a clear view of Foster. Leibee Depo. 47:11–16. Plaintiffs argue that because Officer Leibee did not fire at that time, it was unreasonable for Officer Cornelison to have fired his weapon. Plaintiffs support this with the following testimony of Officer Leibee:

Q. So what did you do when Officer Cornelison moved into your line of fire?

A. I moved to my right.

Q. How far did you move to your right?

A. Maybe one or two steps.

Q. And did you at that point have a clear view of the suspect?

A. I did then.

Q. And at that time why didn't you fire your weapon?

A. Because I felt the threat had not presented itself at that time. The shots had already been fired, [I] wanted to reassess to see what the next plan of action would be.

Leibee Depo. 47:9–22. Plaintiffs argue based on the last answer that Officer Leibee did not believe deadly force was necessary and thus Officer Cornelison was objectively unreasonable in applying it.

When read in its totality, Officer Leibee's testimony does not support Plaintiffs' position. Officer Leibee testified that if Officer Cornelison had not moved into his line of fire, he would have fired his weapon. Leibee Depo. 47:3–5. The language on which Plaintiff relies relates to the time immediately *after* Officer Cornelison fired his weapon, i.e. Officer Leibee considered firing on Foster after Officer Leibee regained his clear view but did not because Officer Cornelison had already fired his weapon and Officer Leibee wanted to reassess the situation. Leibee Depo. 47:19–22; 48:3–8. Officer Leibee's failure to fire his weapon does not create a genuine issue of material fact.

### (6) Officer Cornelison's Position & Actions

Plaintiffs base much of their opposition to summary judgment on the conclusions of Dr. James Cooper, who performed a second look autopsy on Foster approximately two weeks after the shooting. Plaintiffs argue in sum that Officer Cornelison was "closing in" on Foster as he fired his weapon and that Foster was turned toward Officer Cornelison such that Officer Cornelison must have been able to see that Foster was unarmed. In order to address Plaintiffs' arguments regarding the positioning of Foster and Officer Cornelison, the four gunshot wounds must be summarized.[10] Dr. Cooper acknowledged that it was impossible to determine which wound was inflicted first, but opined that Wound D was the first shot to hit Foster. Cooper Depo. 43:7–14.

Wound A was a gunshot wound to the back of the right shoulder. Gopal Rep. at 3; Cooper Decl. ¶ 7A. It caused soft tissue injury only and was not life threatening. "The trajectory was predominantly downward, with minor back to front and right to left components." Cooper Decl. ¶ 7A.

Wound B was a gunshot wound to the back of the right shoulder. Gopal Rep. at

---

**10.** These summaries are taken in part from the declaration of Dr. Cooper and in part from the original autopsy report prepared by Dr. Gopal, which was attached as part of Exhibit 3 to Dr. Cooper's deposition. Dr. Cooper does not dispute the findings of Dr. Gopal as to the entry wounds, Cooper Depo. 57:12–14, or the trajectories, *Id.* at 58:11–17.

3; Cooper Decl. ¶ 7B. It damaged the axillary vein and was life threatening. Cooper Decl. ¶ 7B. The trajectory was similar to Wound A, downward with minor back to front and right to left components. *Id.*

Wound C was a gunshot wound to the back of the arm. Gopal Rep. at 4; Cooper Decl. ¶ 7C. This shot entered the back of the right arm, exited the arm with approximately an inch of skin in between, and reentered the chest cavity. *Id.* This wound injured the lungs and was life threatening. Cooper Decl. ¶ 7C. The trajectory was from back to front and very slightly downwards.[11] Gopal Rep. at 4.

Wound D was a gunshot wound to the right side of the back. Gopal Rep. at 5; Cooper Decl. ¶ 7D. This wound was lower and closer to the midline than the other three. Cooper Decl. ¶ 7D. It damaged the liver and was life threatening. The trajectory was from back to front and slightly right to left. *Id.* Unlike the other three wounds, there was no downward component to this wound's trajectory. *Id.*

The final wound was a dog bite wound to the right side of the lower back. Gopal Rep. at 6; Cooper Decl. ¶ 7E.

Plaintiffs argue that these wounds and trajectories discredit Officer Cornelison's version of the facts because, according to Dr. Cooper, "the impact points and trajectories of gunshot wounds A, B and C would require a significant position change in either the shooter or the victim, or both." Cooper Decl. ¶ 10.

Officer Cornelison testified that he was approximately ten to fifteen feet away from Foster at the time of the shooting. Cornelison Depo. 82:2–4. As to Foster's position, Officer Cornelison testified that he did not see what happened to Foster's body as each shot hit him because the

shots were fired in rapid succession, but that he did not recall any major position change, like throwing his hands up or falling down, as the shots impacted Foster. Cornelison Depo. 84:1–18. Officer Cornelison testified that, after all the shots were fired Foster "[i]t looked like [Foster] slumped a little bit, but he was still mostly in the same position." Cornelison Depo. 84:21–23.

Dr. Cooper avers that either Officer Cornelison was standing over Foster or, if Officer Cornelison's position remained the same, Foster "would need to be prone, or approaching a prone position, with his head toward the shooter rather than away from him." *Id.* Dr. Cooper concludes that "[t]hese discrepancies indicate that the sequence of events in this case could not have happened the way that Officer Cornelison describes them in the police report and in his deposition testimony." Cooper Decl. ¶ 12.

Plaintiffs, apparently interpreting Dr. Cooper's findings, argue with respect to Wound C that it "is undisputed that this bullet entered the front of Mr. Foster's shoulder first.. indicat[ing] that at the time of the shot, Mr. Foster was facing Officer Cornelison." Pls.' Opp'n at 20. Neither Dr. Gopals' nor Dr. Cooper's report supports the contention that Foster was facing Officer Cornelison when Wound C was inflicted. Both reports indicate that the bullet entered the back of the right arm, went through the arm, and entered the chest cavity. There is no evidence to support the claim that Wound C entered the front of Foster's shoulder first.

Plaintiffs also argue that there is a dispute as to whether Officer Cornelison was moving based on the location of the expended shells from Officer Cornelison's weapon. Plaintiffs' expert, Mr. Saunders,

---

**11.** Dr. Cooper's declaration indicates that it is "difficult to be very specific as to the original trajectory of the round," but, again, Dr. Coo-

per testified at his deposition that he agreed with Dr. Gopal's findings regarding the trajectories. *Supra,* n. 10.

concluded from the location of these shells, as depicted in the map of the scene made by the police, that Officer Cornelison must have been moving as he fired his weapon such that Officer Cornelison was between three and six feet of Foster when Officer Cornelison fired the final round. Saunders Decl. ¶¶ 12–13.

Putting aside for a moment that Dr. Cooper, Plaintiffs' other expert, agreed that Officer Cornelison's testimony that he was 10–15 feet away from Foster was consistent with his (Dr. Cooper's) opinion, Cooper Depo. 90:2–5, and that Plaintiffs did not dispute Defendants' UMF No. 83, which states that Officer Cornelison was 10–15 feet from Foster at the time he fired, Defendants correctly argue that Mr. Saunders' is not qualified to render such an opinion. Rule 702 of the Federal Rules of Evidence allows admission of testimony by "a witness qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. In his curriculum vitae Mr. Saunders purports to be an expert in the fields of police procedures, training, deadly and non-deadly force, officer safety, and pursuits and security. Saunders Decl. Ex. 1. Mr. Saunders is not an expert in ballistics or crime scene reconstruction. Moreover, he has never owned or shot a .40 caliber Beretta, the gun used by Officer Cornelison. Saunders Depo. 59:03–06. There is no indication that Mr. Saunders is qualified to render an opinion based on a the location of the shell casings. Even if Mr. Saunders were qualified to render such opinions, his conclusions with respect to this issue are unreliable. *See Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063–64 (9th Cir.2002) (trial court has obligation to determine reliability of expert testimony and broad latitude

in so doing). Mr. Saunders' conclusion is based on a discussion with a range master, whose name and affiliation Mr. Saunders could not recall, and is not based on any further research or testing by Mr. Saunders. Mr. Saunders has presented no reliable basis for his conclusions.

Mr. Saunders also concludes that Officer Cornelison's description of the scene is implausible because "if Saxon had been biting Mr. Foster when Russell Cornelison fired his weapon, as the officer claims, the dog would have been in the direct line-of-fire and would more than likely have been hit by one or more of those bullets. Obviously, according to the police report, that did not happen." Saunders Decl. ¶ 14. Again, Mr. Saunders is not an expert in handling and training of canines or canine officers. Also, his conclusion is unsupported by any physical evidence and is speculation. Moreover, as Officer Cornelison testified, police canines are trained to be neutral to, i.e. ignore, gunfire. Cornelison Depo. 94:1–4. Even if Officer Cornelison did disregard the safety of Saxon, this is a tactical error that does not create a genuine issue of material fact as to the respective positions of Foster and Officer Cornelison.

Assuming, *arguendo*, as Dr. Cooper opines, that Foster's position changed or that Officer Cornelison approached Foster,[12] it nonetheless remains that all of the entry wounds are on the back of Foster's body and all of the trajectories are from back to front. This physical evidence is consistent with Officer Cornelison's testimony that at no time could he see Foster's hands. There is no physical evidence to support Plaintiffs' contention that Foster turned around and faced Officer Cornelison.[13] It will be assumed for purposes of

---

**12.** None of the officers testified that Officer Cornelison was, at any time, standing directly above Foster and firing into him.

**13.** The trajectories for Wounds A, B, and D were described by Dr. Gopal as being slightly right to left, Gopal Rep. at 3–5, which indicates that, at most, Foster was in the process of

this motion that Foster was approaching a prone or semi-prone position, but that he did not turn around.

### (7) The Shots Were Fired in Rapid Succession

Plaintiffs argue that there is a dispute as to the timing of the shots. Plaintiffs assert that "[t]here was a pause between the first shot and the second round of shots." Pls.' Opp'n at 18. Defendants argue that all three officers indicated that the four shots were fired in rapid succession. *See* Cornelison Decl. ¶ 30; Leibee Decl. ¶ 25; Suarez Decl. ¶ 23.

Plaintiffs argue that a statement made by Officer Suarez in an interview the morning following the shooting undermines this. Pyle Decl. Ex. D. Officer Suarez described the shots to Detective Garcia as follows: "I heard *a shot or two*. I can't remember how many shots were fired." *Id.* (emphasis added). In his deposition, Officer Suarez testified as follows: "Q. And were the shots fired, did they come right after one another, bam, bam, bam, bam, like that ... ? A. To me it appeared that they did." Suarez Depo. 50:20–23. Officer Suarez's earlier assertion that he hear one or two shots is not inconsistent with his later sworn testimony that he heard shots fired in rapid succession. The interview cited by Plaintiffs is not evidence from which a jury could reasonably find that a pause occurred. It is thus undisputed that Officer Cornelison shot Foster four times in rapid succession.

### 3. Analysis

▉ The undisputed facts and the disputed facts that are viewed in the light most favorable to Plaintiffs are summarized as follows: Foster was a suspect in a series of armed robberies, a dangerous

felony; Foster had fled and had been attempting to evade arrest; Officer Cornelison reasonably believed that Foster was armed with a gun; Foster did not respond to the officers' commands; Foster did not significantly respond to the application of Saxon initially, but the dog was successful at extracting Foster from the bushes; Foster raised his arm up; Foster moved his arm down toward his waistband area, but did not "jam" his hand down or fumble around; Officer Leibee characterized the motion as "threatening" and would have fired but for Officer Cornelison's moving into his line of fire; Officer Cornelison fired four shots in rapid succession; the shots hit Foster on his back and the back of his right arm and shoulder; and as Officer Cornelison fired, Foster changed position and became more prone or semi-prone.

Bearing in mind the "broad discretion that must be afforded to police officers who face a tense situation," *Jeffers, supra,* 267 F.3d at 909, and that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham, supra,* 490 U.S. at 396, 109 S.Ct. 1865, a reasonable officer in Officer Cornelison's position would have believed that Foster posed an immediate threat of serious harm. Officer Cornelison's application of deadly force was thus objectively reasonable.

Neither the physical evidence put forth by Plaintiffs nor the minor inconsistencies in the officers' versions of the situation create a dispute as to the critical facts in this case: that Officer Cornelison reasonably believed Foster was armed and that all three officers saw Foster move his arm down. It is these undisputed facts that provided Officer Cornelison with probable

of turning and further undermines Plaintiffs' argument that Foster turned around and

faced Officer Cornelison.

cause to use deadly force. Whether Foster or Officer Cornelison moved after the shots were fired is irrelevant to the question of whether Foster posed an immediate threat immediately before the shots were fired. Similarly, the tactical errors put forth by Plaintiffs' expert, Mr. Saunders, are "nothing but 20/20 hindsight that take[ ] no account of the need to act in emergency situations." *Billington, supra,* 292 F.3d at 1191.

This determination is consistent with the recent Ninth Circuit decision of *Blanford v. Sacramento County,* 406 F.3d 1110 (9th Cir.2005), in which the Ninth Circuit upheld summary judgment on the constitutional question.[14] There, the plaintiff, Blanford, was carrying an edged sword and was shot and severely injured by police after he ignored commands to stop and drop the sword and attempted to enter a house that, unbeknownst to the officers, was actually his house. *Id.* at 1112. The court found the officers' shooting of Blanford objectively reasonable because the officers had probable cause to believe that Blanford "posed a threat of serious physical harm to [the officers], or to others, because he was armed, refused to give up his weapon, was not surrounded, and was trying to get inside a private residence or in default of that, into the back yard, where his sword *could inflict injury* that the deputies would not have been in a position to prevent." *Id.* at 1117–18 (emphasis added). The court also found that a second and third round of shots were objectively reasonable because "the deputies knew that Blanford had committed a crime, albeit not a violent one, and was continuing a course of conduct that objectively indicated he was not giving up the sword that made him a threat to anyone in charging range." *Id.* at 1118–19.

Here, unlike in *Blanford,* Foster was suspected of committing a violent crime, armed robbery, and had fled the scene of a car accident in an attempt to evade arrest. Most important, here, Foster made a move that Officer Cornelison reasonably believed posed an immediate threat because the officers believed Foster was armed at the time. In contrast, in *Blanford,* the court found no constitutional violation despite the fact that Blanford did not actually make a threatening movement toward the officers. *Blanford,* 406 F.3d at 1120 (Noonan, J., dissenting) ("the significant threat must also be immediate ... [t]he officers have not been able to name a single human being who was significantly or immediately threatened by Matthew Blanford").

The undisputed facts in this case demonstrate that Officer Cornelison's actions were objectively reasonable. Accordingly, no constitutional violation of Foster's rights occurred and summary judgment as to Plaintiffs' first claim is GRANTED. As a result, Defendants are also entitled to summary judgment as to Plaintiffs' second cause of action for violation of their own due process rights, and it is hereby GRANTED.

**B. Was the Right Clearly Established at the Time?**

The determination that no constitutional right was violated obviates a need for discussion of the second prong of the *Saucier* test. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Billington,* 292 F.3d at 1191.

**VI. Plaintiffs' Remaining State Law Claims**

■ Defendants argue that they are entitled to summary judgment as to Plaintiffs' remaining state law claims, claims

---

**14.** The court decided the issue on the constitutional question, but also upheld summary judgment in the alternative on the clearly established question. *Blanford,* 406 F.3d at 1112.

five through eight, because Officer Cornelison is immune from liability under California law.

■ Section 196 of the California Penal Code provides that a homicide committed by an officer is justifiable if it was "necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty; or ... when necessarily committed in arresting persons charged with felony, and who are fleeing from justice or resisting such arrest." Cal. Pen. Code § 196. "There can be no civil liability under California law as the result of a justifiable homicide." *Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 349, 54 Cal.Rptr.2d 772 (1996) (finding immunity pursuant to section 820.2 of the California Government Code[15] where force used was determined reasonable).

■ Under California law, an officer may use deadly force to effect an arrest "only if the felony for which the arrest is sought is 'a forcible, and atrocious one which threatens death or serious bodily harm, or there are other circumstances which reasonably create a fear of death or serious bodily harm to the officer or to another.'" *Ting v. United States*, 927 F.2d 1504, 1514 (9th Cir.1991) (quoting *Kortum v. Alkire*, 69 Cal.App.3d 325, 333, 138 Cal.Rptr. 26 (1977) (interpreting Cal. Pen.Code § 196)).

Here, as discussed, Foster was the suspect in a series of armed robberies, a dangerous felony. Also as discussed, Officer Cornelison reasonably believed that Foster posed an immediate threat of death or serious bodily injury when Foster, who was believed to be armed, refused to comply with the officers' orders and returned his hand to his waistband area. Accordingly, Officer Cornelison is entitled to immunity under California law. *See Martinez*, 47 Cal.App.4th at 349–350, 54 Cal. Rptr.2d 772.

■ Section 815.2 of the California Government Code provides that a city cannot be liable for the acts of its employee if the employee is immune from liability. Cal. Govt.Code § 815.2. Because Officer Cornelison is immune from liability, there can be no liability on the part of Defendant Dyer or the City.

Accordingly, summary judgment is GRANTED as to Plaintiffs' remaining state law claims.

**ACCORDINGLY, IT IS ORDERED** that Defendants' motion for summary judgment is hereby GRANTED for the reasons set forth above.

IT IS SO ORDERED.

---

**15.** Section 820.2 provides that "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Govt.Code § 820.2.